**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TWAIN ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 2006 |
| | ) | |
| CAROLYN COLVIN, Commissioner, Social | ) | Judge John J. Tharp, Jr. |
| Security Administration,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Twain Robinson, an African-American Navy veteran who allegedly suffers from post-traumatic stress disorder, brings claims against his former employer, the Social Security Administration (SSA), for violations of the Rehabilitation Act of 1973, 29 U.S.C. § 791 et. seq. and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq. ("Title VII"). Robinsons maintains that his supervisors subjected him to a hostile work environment and discriminated against him because of his race, gender, and disability. Robinson also filed a complaint with the Equal Employment Opportunity Commission (EEOC) based on these same allegations, and shortly thereafter was dealt a two-day suspension for allegedly sexually harassing an SSA customer. Robinson claims that he was actually suspended in retaliation for filing an EEOC complaint. The SSA moves for summary judgment on all of Robinson's claims. For the reasons stated below, the SSA's summary judgment motion is granted.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to 42 U.S.C. § 405(g), Ms. Colvin is automatically substituted as the defendant in this suit. Fed. R. Civ. P. 25.

Robinson is a male African-American who maintains that he was diagnosed by the Veterans Administration (VA) as suffering from PTSD in connection with his service with the United States Navy in Spain.[3] After a short and unsuccessful career in law enforcement, Robinson began his employment with the SSA as a claims representative in July 2007. Def.'s Local Rule 56.1(a) Statement of Material Facts, ECF No. 39, ¶ 1 (DSOF). Robinson's SSA position required him to interview claimants, either by telephone or in person, in order to determine their eligibility for benefits. *Id.* at ¶¶ 7-8. To manage interview-related workflow, Robinson was required to use the "VIP" (Visitor Intake Process) computer system; when a claims representative completed an interview, he or she was required to close out the interview on the VIP system, which would then prompt the next waiting claimant. *Id.* at ¶ 8. Beginning in September 2010, Robinson was supervised by Jonathan Waldron (a male African-American), who in turn reported to District Manager Valrea Thompson (a female African-American). *Id.* at ¶ 2.

According to Robinson, when he started with the SSA in 2007 his presence was not well received. He claims that, shortly after he began work, a coworker, Margery Williams, "snapped at him" and told him he was the "first black man that's ever worked in this office." *Id.* at ¶ 57.

---

[2] These facts are drawn from the undisputed facts in the parties' respective statements of facts. Although Robinson purports to dispute some facts, his objections to those facts do not meet the substance of the fact stated but instead offer arguments about the immateriality of the fact; in such cases, the fact alleged has been deemed admitted. *See, e.g.,* ¶ 10 (no dispute that Waldron saw Robinson away from his desk on back-to-back days at times when the VIP system showed Robinson as interviewing a claimant; ¶ 12 (no dispute that Waldron found Robinson in the break room buying a candy bar while he was speaking with a claimant); ¶¶ 16-18 (no dispute that Robinson was checking personal emails while not on break). Facts that are properly disputed are construed in favor of Robinson, the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

[3] The record does not reflect the nature of the trauma that Mr. Robinson claims to have suffered while stationed in Spain.

Robinson further asserts that Williams, who is also African-American, added, "[w]e don't want you here. So you better watch your back." *Id*.; Pl.'s Local Rule 56.1(a) Statement of Additional Undisputed Facts, ECF No. 44, ¶ 10 (PSAF). Robinson informed Thompson about the incident. DSOF. at ¶ 59. She purportedly responded by saying "they feel threatened by you. They never worked with a black man in this office and probably not with Social Security. So just watch your back because they might try to set you up and get you fired." *Id*. Both Williams and Thompson deny that these conversations occurred. *Id*. ¶¶ 58, 60.

Robinson identifies several incidents during his employment with the SSA as evidence that he was subjected to a hostile work environment. The first incident he identifies occurred on December 2, 2010, more than three years after he began work at the SSA. At that time, Waldron checked the VIP system and saw that it showed Robinson with a claimant when, in fact, he was not conducting an interview. *Id*. ¶ 10. Waldron asked Robinson if he was having problems closing out interviews upon their conclusion, and reiterated the importance of closing out each interview so the VIP system could cue the next claimant. *Id*. Robinson told Waldron that it was a mere oversight, and claims that Robinson was falsely accusing him of intentionally preventing the next interview from loading. A few days later, on December 7, 2010, Robinson conducted a telephone interview on a headset while simultaneously retrieving snacks from the breakroom, in violation of SSA employee policy. *Id*. at ¶ 12. Waldron saw Robinson, and instructed him to stay at his desk when conducting an interview. *Id*. Then, on both January 6 and 7, 2011, Waldron discovered Robinson checking his personal email while on the clock, even though SSA employees are only allowed to check their personal email during breaks. *Id*. at ¶ 17.

On January 20, 2011, Robinson's supervisors received a complaint concerning Robinson from an SSA customer who was the mother of a minor SSA beneficiary. *Id*. at ¶ 33. Robinson

had met the customer in the course of his duties and complimented her looks, asked questions about her "single" status, and pursued a date with her. *Id*. The customer related that she had given Robinson permission to call her after he asked for her number several times, but thereafter she had asked him to stop calling her. When he persisted, she blocked his calls and filed a complaint with the SSA. *Id*.[4] After investigating the matter, Waldron presented Robinson with a notice of a proposed two-day suspension on March 4, 2011. *Id*. at ¶ 35. Thompson made the two-day suspension final on April 25, 2011, because the "serious misconduct" involved "tend[ed] to undermine the image and reputation of the Agency by calling into question whether the public can rely on [SSA] employees to act with integrity and to maintain the confidentiality of [claimant] data." *Id*. at ¶¶ 36, 38.

Robinson believes the two-day suspension was actually imposed in retaliation for an EEOC discrimination complaint he had filed only weeks before. Robinson first sought EEOC counseling on December 9, 2010. He filed a discrimination complaint with the SSA on March 23, 2011, before the suspension was made final on April 25, but several weeks ***after*** Waldron first gave Robinson notice of the proposed suspension. The complaint alleged that the SSA subjected him to "continuous non-sexual harassment on the bases of race (Black), mental

---

[4] Robinson does not dispute the defendant's statement of facts concerning this complaint, but objects to it as hearsay. In the context of this case, however, the customer's statements about Robinson's conduct are not hearsay. They are offered by the defense not for their truth (i.e., not to prove that Robinson in fact harassed the customer), but as evidence of the basis for the defendant's subsequent investigation and disciplinary action (which, Robinson alleges, were discriminatory). Stated another way, in the context of this case it does not matter if the customer's complaints were true; what matters is that the complaints were made and prompted the SSA to investigate further and to take disciplinary action against Robinson. See, e.g., *Liu v. Cook Cty*.,—F.3d—, No. 14-1775, 2016 WL 1019324, at *8 (7th Cir. Mar. 15, 2016) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered" for the adverse action.").

disability (Post Traumatic Stress Disorder) and sex (male)." Compl., ECF No. 9, Ex. A, at 1. In support of his discrimination claim, Robinson made many of the same allegations of discrimination that he sets out in the pending complaint. *See id.* at ¶¶ 1(a), 1(b), 1(e), 1(i), 2. Additionally, in his agency discrimination complaint, Robinson details an incident where his supervisor kneeled in front of him while Robinson was seated and asked if everything was okay. *Id.* at ¶ 3. Robinson alleged this incident supported his claim for sexual harassment. By a letter dated May 2, 2011, pursuant to 29 C.F.R. § 1614.107(a)(1), the SSA dismissed this allegation by for failing to state a claim of discrimination upon which relief may be granted. *Id.* at 4. Accordingly, Robinson was awarded no relief.[5] On January 23 2012, Robinson filed another EEOC complaint for reprisal, alleging that his suspension was issued in retaliation for filing an EEOC complaint. DSOF, Ex. 5, ECF No. 38-6, 1. On May 16, 2013 the agency issued a final decision finding the SSA did not commit reprisal or any other form of discrimination. DSOF, ECF No. 38, Ex. 7 at 14.

On September 19, 2011, Thompson directed Robinson to correct his timesheet to conform his pay to his sign-in sheets. *Id.* at ¶ 40. Robinson claims that he was asked to exclude time he spent on the internet. *Id.* at ¶ 39. Robinson believes Thompson's directive was in retaliation for his EEOC activity some six months earlier because Thompson allegedly did not ask other coworkers to adjust their timesheets even though Robinson had witnessed them doing personal business on the clock. *Id.* at ¶¶ 40, 41. Robinson complains that Waldron and Thompson began to "monitor" Robinson after these incidents, and sat near him while he served customers. *Id.* at ¶¶ 43-44.

---

[5] On December 20, 2012 a final agency decision was issued affirming this procedural dismissal and denying his remaining claims on their merits.

Robinson also claims that he was given inadequate training due to his race and gender. PSAF at ¶ 12. Robinson asserts that Technical Expert Sharon Lui did not provide him with the same access to training as she did to female coworkers. Lui disputes this claim. DSOF ¶ 25. When Robinson indicated he believed his training was inadequate, Thompson recommended he call someone from a different office that could coach and mentor him. *Id*. Robinson complains that this solution was impractical because it would not be fair to him to have to receive guidance from a different office. Robinson felt that Thompson's solution was consistent with William's claim in 2007 that he would not be welcome in the office because he is an African-American male. *Id*. Later, Jose Galvez, Robinson's cubicle mate, agreed to act as a coach and mentor to Robinson, although Galvez eventually told management he no longer wished to continue in that role. *Id*. at ¶ 29. Robinson claims he was unaware that Galvez had been assigned this duty, but does acknowledge receiving help from Galvez. *Id*.

Finally, on January 26, 2012, Robinson sought "reasonable accommodation" to have supervisors refrain from engaging in the alleged acts "underlying his pending EEO complaints." *Id*. at ¶ 46.That request was denied. *Id*. Robinson believes Thompson and Waldron denied his request in order to "exploit and aggravate his service connected disability." *Id*.

Based on these factual allegations, Robinson alleges a hostile work environment and disparate treatment on account of his PTSD disability, his race, and his sex. He also alleges that the SSA retaliated against him and engaged in reprisal because he filed an EEOC complaint.

**DISCUSSION**

Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must construe all facts and inferences in

favor of the nonmoving party. *See Love*, 779 F.3d at 701. If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The nonmovant cannot rely on mere conclusions and allegations to create issues of fact. *See Bladerston v. Fairbanks Morse Engine Div. of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2009) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)). Rather, to defeat summary judgment, the nonmovant "must make a showing sufficient to establish any essential element of [his] cause of action for which [he] will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Within the framework of these principles, Robinson's claims of disability, sex, and race discrimination, along with his reprisal and retaliation claims, are addressed in turn below.

### A. Hostile Work Environment Claims

Counts I, II, and III of Robinson's complaint allege that the SSA subjected him to a hostile work environment on account of his disability (PTSD), sex, and race, in violation of Title VII and the ADA. With any hostile work environment claim,[6] a plaintiff must establish that that his work environment was both objectively and subjectively offensive; that the harassment was based on his race, gender, or disability; that the conduct was severe or pervasive; and that there is a basis for employer liability. *See Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004).

---

[6] The Seventh Circuit has not decided whether allowing a hostile work environment claim is actionable under the ADA. *Lloyd v, Swifty Transp. Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). But that is of no consequence here, as even if the Court were to determine hostile work environment claims were viable under the ADA, Robinson's claim still fails on the merits.

The SSA argues in its opening brief that Robinson's claims fail to meet this test because his work environment was not objectively offensive, nor was any government misconduct that did occur motivated by his disability, race, or sex. Robinson did not respond to these arguments in his response brief or otherwise address his hostile work environment claims. As the defendants point out in their reply, Robinson has therefore waived any opposition to the defendants' arguments with respect to those claims. Def.'s Reply, ECF No. 47, 1 ("Robinson entirely abandoned his disability, race, and sex hostile work environment claims").

In any event, Robinson's hostile work environment claims fail as a matter of law for at least two reasons. First, Robinson fails to demonstrate that his work environment was both objectively and subjectively offensive. The subjective requirement can be satisfied easily enough—the plaintiff must honestly believe the employer's conduct is offensive. *See Hostetler v. Quality Dining, Inc*., 218 F.3d 798, 806-07 (7th Cir. 2000). But even assuming Robinson believed that the conduct he identifies was offensive, he must still satisfy the more difficult requirement that the alleged conduct was objectively offensive. In conducting the objective inquiry, the Court considers "all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger,* 361 F.3d at 975–76. A plaintiff's reliance on "generalized workplace difficulties," is not enough to create a hostile work environment. *Id*.

Here, the circumstances alleged by Robinson fall well short of showing that he was subjected to an objectively hostile work environment. Insofar as Robinson's ADA claim is concerned, he alleges that his PTSD was aggravated by his supervisor "getting into Robinson's personal space and being confrontational on a daily basis." PSAF ¶ 7. But such generalized

workplace difficulties, which ultimately amount to little more than enhanced supervision, fail to create a hostile work environment. *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1013 (7th Cir. 1997) (court noting that "[n]ot every unpleasant workplace is a hostile environment."). Perhaps seeing the futility of such an argument, in his response to the SSA's motion, Robinson attempts to restyle his ADA claim as one of failure to accommodate. But in his amended complaint Robinson did not allege a failure to accommodate; he is therefore foreclosed from doing so now.[7]

With respect to his race and gender-based hostile work environment claim, Robinson's strongest fact is the alleged conversation he had with his coworker, Margery Williams, who "snapped at him" and told him he was not wanted in the office. DSOF ¶ 57. Accepting Robinson's allegations about these statements as true for purposes of the motion, the remark may have been distasteful, but this single incident is not enough to create an objectively hostile work

---

[7] Even if the Court were to construe Robinson's complaint as stating a failure to accommodate claim, as the SSA notes in its reply brief, Robinson has failed to allege he suffers from an ADA qualifying disability. To maintain a failure to accommodate claim, a plaintiff must allege that his disability substantially impairs one of life's major activities. *Furnish v. SVI Sys., Inc*., 270 F.3d 445, 450 (7th Cir.2001). Here, Robinson has offered evidence (albeit based on hearsay) indicating that he was diagnosed with PTSD, but he has offered no facts indicating that this condition limited his ability to engage in life's major functions. *See, e.g.*, *See Hamilton v. S.W. Bell Tel. Co*., 136 F.3d 1047, 1050 (5th Cir. 1998) (affirming summary judgment against plaintiff who failed to establish that PTSD substantially limited him in the performance of a major life activity); *Loperena v. Scott*, 356 Fed. App'x 240, 242 (11th Cir. 2009) (same); *Nicholson v. West Penn Allegheny Health System*, 297 Fed. App'x 157, 159-60 (3d Cir. 2008) (same); *Lane v. Bell County Bd. of Educ.*, 72 Fed. App'x 389, 396-97 (6th Cir. 2003) (same); *Felix v. New York City Transit Authority*, 324 F.3d 102, 105 (2d Cir. 2003) (same). Unquestionably, PTSD can be a serious condition that limits major life activities, but it is not necessarily so and does not constitute a *per se* disability within the meaning of the ADA and the Rehabilitation Act. *See Hamilton*, 136 F.3d at 1050 ("[Plaintiff] claims to suffer from PTSD, which impairment, standing alone, is not necessarily a disability contemplated by the ADA"); *Loperena v. Scott*, No. 2:08-CV-99, 2009 WL 1066253, at *11 (M.D. Fla. Apr. 21, 2009) (finding that even though plaintiff undisputedly suffered from PTSD, she was not disabled within the meaning of the ADA because she failed to establish it substantially limited one of life's major activities).

environment, particularly given that it occurred some three years before any of the other incidents on which Robinson has based his claims. This is a paradigmatic example of a "stray" comment that is insufficient to support a claim of workplace hostility. *See, e.g., Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (stray comments over jail intercom that included the work monkey were insufficient to maintain hostile work environment claim); *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011) (claim that plaintiff was referred to as a "bitch" was a stray remark that failed to create workplace hostility). The other incidents that Robinson cites as offensive, such as being confronted when he failed to properly log out of the VIP system, PSAF ¶ 9, being criticized for the way he interacted with claimants, PSAF ¶ 15, amount to "generalized workplace difficulties," which do not constitute an objectively offensive work environment. *Wyninger*, 361 F.3d at 976. Courts routinely find that far more egregious conduct falls outside the purview of an actionable Title VII claim. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648-49 (7th Cir. 2011) (finding two incidents of coworkers wearing confederate flag clothing and one coworkers racially offensive statement insufficient to establish an objectively hostile work environment); *Ford v. Minteq Shapes & Servs., Inc.,* 587 F.3d 845, 847 (7th Cir. 2009) (supervisor referring to black employee as a gorilla and another supervisor's comment that plaintiff could not lose his job because his company wanted to appear diverse did not rise to level of harassment); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (work environment was not objectively hostile, even when racial and derogatory slurs had been overheard by African-American employees on a number of occasions); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (being treated in a rude manner by coworkers not sufficiently severe or pervasive). Accordingly,

Robinson has failed to allege any facts indicating that his work environment was objectively offensive with regard to his race.

Otherwise, Robinson alleges virtually no facts that could lead a reasonable juror to find that he was subjected to any form of racial or sexual harassment or sexually offensive conduct at all, much less to the extent required to create an objectively offensive environment. Robinson's claim that he did not receive the training he needed because of his sex is not sexually offensive conduct, and in any rate is not supported by any facts on the record other than his own speculation. *See Tovar v. United Airlines, Inc*., 985 F.Supp.2d 862, 874 (N.D. Ill. Nov. 1, 2013) (granting summary judgment for the defendant on hostile work environment claim, because plaintiff's allegations were mere speculation unsupported by the record). There is, in short, scant evidence that Robinson faced anything that amounted to objectively offensive treatment in the workplace, and Robinson's hostile work environment claims therefore fail.

They also fail because the evidentiary record falls similarly short in creating a jury issue as to whether Robinson was subjected to the purportedly offensive conduct because of his disability, race, or sex. To be actionable, any harassment that created the allegedly hostile work environment must have been based on Robinson's race, sex, or disability. *See Wyninger*, 361 F.3d at 975; *Vance*, 646 F.3d at 469. The bulk of the "hostility" Robinson identifies are questions, reprimands, and disciplinary actions taken against Robinson by his supervisors (both of whom were also African-American, and one of whom was also male), but Robinson has adduced no evidence to support a reasonable inference that his supervisors were hostile to him because of his race or gender. During his deposition, when asked why he thought that his male African-American supervisor was reprimanding him Robinson stated he "can't figure out a reason why. It's either because I'm a man or because I'm a black man." Def.'s Ex. 1, ECF No.

38-3, ¶¶ 60:17-19. But Robinson offers no facts in support of this conclusory statement and his speculation that his supervisors' conduct was based on animus toward his race or gender is not enough to get his claim to a jury. *See, e.g., Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) (Plaintiff's claim that she was denied access to new client information because of her sex, and thereby discriminated against, was not enough to survive summary judgment because "reliance on speculation is not enough to get the case to the jury."); *Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) (noting that "when the evidence provides for only speculation or guessing, summary judgment is appropriate."); *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 2003) (same).

Waiver aside, then, because Robinson has failed to point to any evidence that could lead a reasonable juror to believe his work environment was objectively offensive, or that any offensive conduct that did occur was because of his race, sex, or disability, his hostile work environment claims fail as a matter of law.

### B. Race and Sex Discrimination Claims

In counts II and III of his complaint, in addition to stating the hostile work environment claims discussed above, Robinson alleges that he was treated disparately on account of his race and sex. He proceeds under the "indirect" method of proof, and therefore must have offered sufficient evidence to establish a prima facie case of racial discrimination. To do so, he must show that he (1) is a member of a protected class; (2) met his employer's legitimate performance expectations; (3) suffered adverse employment action; and (4) was treated less favorably than other similarly situated employees who were not members of the protected class. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). If Robinson satisfies the requirements of a prima facie case, the burden of production shifts to the SSA to show that the basis for its

employment action was nondiscriminatory. *Id.* The SSA argues that Robinson fails to establish

he is a member of a protected class with respect to his sex discrimination claim is concerned, was

not meeting the SSA's legitimate employment expectations, does not identify similarly situated

employees who were treated differently, and fails to point to an adequate adverse employment

action.

With respect to Robinson's reverse sex discrimination claim, in lieu of the first element—

being a member of a protected sex class—Robinson must show "background circumstances"

suggesting that anti-majority discrimination has occurred. *Mills v. Health Care Services Corp.*,

171 F.3d 450, 457 (7th Cir. 1999). Such circumstances include "evidence indicating that the

particular employer at issue has some reason or inclination to discriminate invidiously against

[men]," and "evidence indicating that there is something 'fishy' about the facts of the case at

hand." *Id.* at 455 (citing *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)). But here, Robinson

fails to offer any such evidence. His sex discrimination claim therefore fails on this basis alone.

*See Formella v. Brennan*, —F.3d—, No. 1:15-CV-1402, 2016 WL 908939, at *4 (7th Cir. Mar.

10, 2016) (plaintiff's reverse discrimination claim failing on summary judgment because

"[plaintiff] failed to present any argument in his opposition to [defendant's] motion regarding

background circumstances . . . or anything "fishy" about the facts of his case.").

But even if Robinson did offer evidence suggesting an anti-male bias at the SSA, both his

race-based and sex-based claims would still fail because the record overwhelmingly supports a

conclusion that his job performance was unsatisfactory. Robinson repeatedly failed to meet his

employer's performance expectations. On numerous occasions, Waldron counseled Robinson

orally for walking around while interviewing a claimant, or checking personal email during work

hours. DSOF ¶¶ 12, 17. Most significantly, Robinson was suspended for an inappropriate

interaction with a female customer. *Id*. at ¶¶ 33-38. Such conduct cannot reasonably be characterized as meeting employer expectations. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013) ("An employee who sexually harasses…cannot be considered to be meeting his employer's legitimate expectations 'by any strength of the imagination.'").

Robinson argues, however, that he can still establish *prima facie* cases of sex and age discrimination because he has offered circumstantial evidence of the SSA's discriminatory motivations. Pl.'s Resp. to Def.'s Mot. for Summ. J., ECF No. 43, 9-10. Robinson claims that while the SSA strictly enforced its personal email policy against him, it did not do so with respect to similarly situated female and non-African American employees. But "in disciplinary cases—in which a plaintiff claims that [he] was disciplined by [his] employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that [he] is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000). A plaintiff may demonstrate that another employee is "similarly situated" to him by "show[ing] that there is someone who is directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002).

Robinson fails to identify any such individuals. He relies instead on the general claim that the he cited "numerous examples of similarly situated female employees and non-Black employees being treated differently and better than [he]" but fails to cite to any such example. Plt.'s Resp. at 14. Such conclusory allegations that have no support in Robinson's motion are insufficient to survive summary judgment, *see Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004), as "such conclusory statements, not grounded in specific facts" fail to establish that a similarly situated employee was treated differently. *See id*.

Which brings us to the requirement of an adverse action. For an employment action to be considered adverse and create an actionable disparate treatment claim, "it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). In making this inquiry, courts seek to avoid incurring liability on employers for "trivial personnel action[s]" brought by "irritable, chip-on-the-shoulder employee[s]." *Herrnreiter,* 315 F.3d at 745.

The adverse employment action that Robinson points to is his belief that his supervisors, Waldron and Thompson, subjected him to "heightened scrutiny" because of his race and gender (notably, he does not argue that his two-day suspension constituted an adverse employment action that resulted from discrimination; as noted below, however, Robinson cites the suspension as evidence of retaliation). But Robinson's subjective belief that he was scrutinized more than other employees does not constitute an adverse employment action. *See Jones v. Res-Care*, *Inc.*, 613 F.3d 665, 670-671 (7th Cir. 2010) ("a plaintiff's subjective determination of tension in the workplace, without more, cannot constitute an adverse employment action absent a tangible job consequence."); *Fane*, 480 F.3d at 539 (plaintiff's subjective belief that she worked more than other employees was insufficient to show that she actually had a heavier workload); *Trimble v. Alliance-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 775-75 (N.D. Ill. 2011) (granting summary judgment to defendant on plaintiff's retaliation discrimination claims based on monitoring/supervision, where "only evidence of the monitoring and its frequency comes from her own affidavit.").

Robinson offers a number of cases in support of his contention that the increased supervision he was subjected to constituted an adverse employment action, but all those cases are

inapposite as they involved tangible job consequences that were far more extreme than any conditions that Robinson endured. For example, Robinson points to *Collins v. Illinois*, but that case involved a plaintiff who was the *only* African American employee in his department and was subjected to a formal evaluation every three months instead of annual reviews like his coworkers and all those evaluations were negative in contrast to evaluations under his previous supervisor. 820 F.2d 692 (7th Cir. 1987). The plaintiff in *Collins* was then transferred to a new department and relegated to an isolated desk with no telephone, business cards, or business responsibilities. *Id*. But here Robinson was not transferred to another department and was never given reduced responsibilities. To the contrary, when Robinson was struggling to meet expectations his employer assigned him a mentor to help him remediate. In short, Robinson was not isolated and stripped of his job responsibilities; to the contrary, the SSA monitored him to ensure that he carried out those responsibilities appropriately.[8]

---

[8] The other cases Robinson cites are similarly inapt. In *Flanagan v. Office of the Chief Judge*, in ruling on the defendant's motion for judgment as a matter of law, the district court held that because the plaintiff probation worker was pulled from field duty and placed behind a desk it was reasonable for the jury to conclude she was subject to an adverse employment action. No. 06-v-1462, 2007 WL 2875726, at *10 (N.D. Ill. Sept. 28, 2007). The district court noted that the testimony adduced at trial indicated that being relegated to desk assignments constituted a significant reduction in responsibilities for a probation officer, and thus materially altered the plaintiff's employment. But here, unlike in *Flanagan*, Robinson did not receive a reduction in responsibilities while employed at the SSA. Instead, he was merely subject to increased supervision. True, as Robinson notes, the court in *Flanagan* also found significant that the plaintiff was subjected to "heightened scrutiny" while she was being investigated for violating probation department protocol. But that significance was premised on the fact that the excess supervision made her fellow probation officers fear they too would be brought under investigation if they worked with her. Thus, the court reasoned, her workplace was materially altered because the increased supervision dissuaded officers from being the plaintiff's partner. *Id*. at *9. Johnson offers no analogous facts indicating that the additional supervision he experienced materially altered his workplace; only facts indicating the supervision in fact occurred. Robinson also cites *Lewis v. City of Chicago* 496 F.3d 645, 654 (7th Cir. 2007), but it too is inapposite. There the court held it was possible the plaintiff suffered an adverse employment action because she was prevented from participating in a special assignment that would have entitled her to overtime compensation and given her a "once in a lifetime experience." *Id*. at 654.

Thus, because Robinson fails to put forth any facts that could satisfy the requirements of a prima facie disparate treatment claim, no reasonable jury could find for him and the defendant's summary judgment motion with respect to Robinson's gender and race disparate treatment claims is granted.

### C. Reprisal and Retaliation Claims

Robinson claims in Count IV that the two-day suspension he received as a result of his inappropriate conduct with a female SSA claimant was actually a reprisal for filing an EEO grievance. In Count V he contends that the SSA retaliated against him in violation of Title VII's retaliation provision. The SSA argues that Robinson fails to provide facts that could support either count, and the Court agrees.

Although Robinson sets forth "reprisal" and "retaliation" as separate counts, there is no discernible difference between them. A plaintiff asserting retaliation may proceed under either direct or indirect method of proof, but both methods require evidence sufficient to establish that he engaged in protected activity under Title VII and that he suffered a materially adverse employment action. They differ only with respect to the element of pretext. While both require evidence of a causal connection between the protected activity and the adverse action, under the direct method a plaintiff must show that retaliatory animus motivated the SSA's adverse action against him, *see, e.g., Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012), while under the indirect method of proof, he may shift the burden of production on pretext to the employer if he is able to point toa similarly situated employee who did not engage in the statutorily protected activity and received better treatment. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Robinson's claim falls short under either approach.

As an initial matter, it is apparent that Robinson engaged in protected activity. When a plaintiff files formal charges with a government agency, it is "the most obvious form of statutorily protected activity." *Greengrass v. International Monetary Systems Ltd*., 776 F.3d 481, 485 (7th Cir. 2015).

As to whether Robinson suffered a materially adverse employment action, in Title VII retaliation claims an adverse action may be actionable even if it does not significantly alter the terms and conditions of employment. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). The applicable test is whether the "challenged action [is] one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Illinois Dep't of Transp*., 474 F.3d 455, 461 (7th Cir. 2007). Mere disciplinary action taken against an employee for violating employer policy is insufficient to be considered a materially adverse action. *See Jones v. Res-Care, Inc.*, 613 F.3d 665, 670-71 (7th Cir. 2010) (plaintiff's subjective determination that disciplinary action created "palpable tension" was insufficient to constitute an adverse employment action element for retaliation claim); *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluations . . . do not constitute adverse employment actions."). Here, Johnson points to being forced to correct his timesheet, being monitored more closely than other employees, and allegedly being placed on "100% case review", as evidence of an adverse employment action. But Robinson does not dispute that he in fact was using his personal email during working hours and that he failed to log out of the VIP system. Given that it is also undisputed this conduct violated SSA policy and procedure, any disciplinary action he received as a result  can only be construed as a  reasonable consequence of Robinson's failure to

abide by those same policies. Accordingly, such conduct cannot rise to the level of a materially adverse employment action.

But Robinson did receive a two-day suspension for purported inappropriate conduct with an SSA customer. Such conduct, unlike onsite remedial supervision, could amount to a materially adverse employment action. *See, e.g., Russell v. Bd. of Trustees of U. of Illinois at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (five-day suspension constituted a materially adverse employment action). Yet it is also apparent that the SSA's two-day suspension of Robinson was not motivated by retaliatory animus. For an employee to establish a retaliation claim they must show that the employer took action against the employee because they engaged in protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). Robinson's brief does not indicate whether he is proceeding under the direct or the indirect methods, but he fails to satisfy the requirements of either.

First, in applying the direct method, Robinson can avoid summary judgment by pointing to evidence of record sufficient to create a fact question as to whether a retaliatory animus was the true reason for his suspension. This can be done by providing an admission by the SSA. For example, if Johnson's supervisors had stated "I am placing you on a two-day suspension because you filed an EEOC complaint," *See O'Leary v. Accretive Health, Inc*., 657 F.3d 625, 630 (7th Cir. 2011), then Robinson would have readily established direct evidence of retaliation. But this sort of extrajudicial admission is rare, and Robinson may also satisfy the direct method of proof by presenting a "convincing mosaic" of circumstantial evidence that would permit the same inference without the SSA's admission. *See id.* This mosaic may consist of suspicious timing, ambiguous statements, and other "bits and pieces from which an inference of [retaliatory] intent might be drawn." *Coleman*, 667 F.3d 860 (internal citations omitted).

But Robinson provides no such convincing mosaic of information. Although Robinson's March 2011 EEO complaint was filed shortly before his April 2011 suspension was finalized, the record shows clearly that the suspension was proposed weeks ***before*** Robinson filed the EEOC complaint. It is clear, therefore, that the suspension was not, at least as an initial matter, animated by retaliatory intent. Further, even if the suspension had been proposed after Robinson filed his EEOC complaint, timing alone, absent other evidence, is insufficient to carry his claim to a jury. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (court finding that plaintiff who relied only on temporal proximity could not "overcome the general rule that suspicious timing alone is insufficient to support a claim of retaliation," even though alleged retaliation occurred "just days" after engaging in protected activity.) Further subverting Robinson's claim that his suspension was motivated by retaliatory animus is that it is uncontested his suspension was connected to the reported customer complaint of harassment. Thus, other than that the suspension was formalized shortly after Robinson filed his EEOC complaint, there is nothing indicating the suspension was levied against him in bad faith. *See Vaughn*, 715 F.3d at 1007 (granting summary judgment for defendant where plaintiff accused of sexually harassing co-worker; stating that the "relevant inquiry is whether management believed in good faith that its decision with respect to [plaintiff] was appropriate to remedy behavior which, based on the information then available, only could be described as harassment."). Last, and as discussed in the context of Robinson's disparate treatment claims, he has offered no evidence that a similarly situated employee was treated differently. Thus, Robinson ultimately fails to piece together sufficient tesserae of circumstantial evidence to craft the "convincing mosaic" necessary to demonstrate that his supervisors acted with retaliatory animus.

That Robinson identifies no similarly situated employee who was treated differently than he also means that he cannot establish a prima facie case under the indirect method in order to shift the burden to his employer to provide a non-discriminatory reason for its action. To shift the burden of production regarding retaliatory animus to the SSA, Robinson must establish that he was meeting the SSA's legitimate expectations and that no similarly-situated employees who did not engage in protected activity were not subjected to an adverse employment action. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004).

Robinson has adduced evidence of neither proposition. The uncontradicted evidence of record demonstrates that Robinson was suspended because he made comments to a female claimant about her appearance, aggressively asked for permission to contact her, and then pursued her even when she asked him to stop. DSOF ¶¶ 33-34. Sexual harassment of a member of the public with business before the SSA plainly falls far below "satisfactory performance." *See Vaughn*, 715 F.3d at 1006.

Robinson also fails to offer facts indicating that he was treated differently from other similarly situated employees. To determine whether employees are similarly situated for the purposes of analyzing a Title VII retaliation claim, the employees must be "directly comparable in all material respects." *Hudson*, 375 F.3d at 560 (citing *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520 (7th Cir. 2003)). As discussed in the context of his discrimination claims, Robinson fails to offer any facts that could lead a reasonable juror other employees who were similar in all material respects were treated differently than he was. DSOF ¶ 40. Nowhere has Robinson established that there are other employees who did not engage in protected activity, and that were similar in all other respects to him, who were not disciplined for sexually harassing claimants. Accordingly, no reasonable juror could find that any disciplinary action taken against Robinson

was done in reprisal for him engaging in protected activity, and the defendant's summary judgment motion is granted as to Counts IV and V.

* * * * *

Because even when viewing the facts in a light most favorable to Robinson there are no relevant factual disputes, and a reasonable jury could only find for SSA on all of Robinson's counts, the SSA's summary judgment motion is granted.

Date: March 24, 2016

_____
John J. Tharp, Jr.
United States District Judge